TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

ROB BONTA
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | |
| | : | No. 23-302 |
| of | : | |
| | : | November 30, 2023 |
| ROB BONTA | : | |
| Attorney General | : | |
| | : | |
| KARIM J. KENTFIELD | : | |
| Deputy Attorney General | : | |

The HONORABLE DAVID A. ALVAREZ, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on questions relating to the legal compatibility of government offices.

## QUESTIONS PRESENTED AND CONCLUSIONS

1. Under state law, may an appointed public member of the City of San Diego Audit Committee concurrently serve as: (a) an appointed public member of the San Diego Association of Governments (SANDAG) TransNet Independent Taxpayer Oversight Committee; (b) an appointed public member of the SANDAG Audit Policy Advisory Committee; or (c) the Internal Auditor of the San Diego Metropolitan Transit System?

As to (a) and (b), an appointed public member of the City Audit Committee may not serve concurrently as an appointed public member of either the SANDAG TransNet Independent Taxpayer Oversight Committee or the SANDAG Audit Policy Advisory Committee. Such concurrent service would violate Government Code section 1099, which prohibits serving in legally incompatible public offices.

As to (c), an appointed public member of the City Audit Committee may serve concurrently as the Internal Auditor of the San Diego Metropolitan Transit System

1

without violating section 1099, because the Internal Auditor position is not a public office. Such concurrent service also would not violate Government Code section 1126's prohibition against engaging in incompatible outside activities, unless the City Council determines that serving as the System's Internal Auditor is incompatible with the duties of a City Audit Committee member. Other state laws prohibiting financial and personal conflicts of interest would not prohibit the concurrent holding of these positions either. Those laws generally apply to particular government transactions or decisions, not the simultaneous holding of government positions, and, in any event, the request does not reference any type of financial or personal conflict.

2. Would the City Council of San Diego violate state law by appointing a member of the public to the City Audit Committee if doing so would result in the appointee holding incompatible public offices in violation of Government Code section 1099?

No. The City Council would not violate state law by appointing a member of the public to the City Audit Committee if doing so would result in the appointee holding incompatible public offices in violation of Government Code section 1099. Although section 1099(b) provides that a *public officer* who accepts a second, legally incompatible public office thereby forfeits the first office held, neither section 1099, nor any other authority we are aware of, provides that an *appointing authority* violates or is subject to any sanction under state law by making such an appointment.

## BACKGROUND

This opinion request concerns three government entities that serve the transportation needs of San Diego County residents, along with the committees and personnel that help oversee their work. First, the City of San Diego is a charter city governed by a nine-member City Council.[1] Relevant here, the City's Charter establishes an Audit Committee (City Audit Committee) as an "independent body" with "oversight responsibility regarding the City's auditing, internal controls, and . . . other financial or business practices."[2] The Audit Committee consists of two members of the City Council and three members of the public (referred to herein as "public members").[3]

Second, the San Diego Association of Governments, or SANDAG, is a regional transportation planning agency and council of governments.[4] Established in its current

---

[1] See The City of San Diego, City Councilmembers, https://www.sandiego.gov/citycouncil (as of Nov. 28, 2023).

[2] San Diego City Charter, art. V, § 39.1.

[3] San Diego City Charter, art. V, § 39.1.

[4] See SANDAG, About, https://www.sandag.org/about (as of Nov. 28, 2023).

2

form by the state Public Utilities Code, SANDAG plans and constructs transportation projects throughout San Diego County.[5] SANDAG also administers the TransNet program, a sales tax within the County that funds local transportation projects.[6] SANDAG is governed by a 21-member Board of Directors consisting solely of elected officials.[7] Several SANDAG committees help oversee the agency's operations, including the TransNet Independent Taxpayer Oversight Committee (ITOC) and the Audit Policy Advisory Committee (SANDAG Audit Committee).

Third, the San Diego Metropolitan Transit System (MTS) is a regional public transit provider.[8] Also created by the state Public Utilities Code, MTS provides light rail, bus, and freight service in portions of San Diego County.[9] MTS is governed by a 15-member Board of Directors consisting solely of elected officials.[10] MTS employs an Internal Auditor who audits the System's internal controls and operations.[11]

In recent years, an appointed public member of the City Audit Committee has simultaneously served on both the ITOC and the SANDAG Audit Committee.[12] Another appointed public member of the City Audit Committee has simultaneously worked as the MTS Internal Auditor.[13] This opinion request asks whether such concurrent government service would violate state law. It further asks whether the San Diego City Council would violate state law if its appointment to the City Audit Committee resulted in the appointee holding legally incompatible offices.[14]

---

[5] See Pub. Util. Code, § 132350 et seq. (consolidating several existing transit-related agencies under SANDAG).

[6] See SANDAG, SANDAG TransNet Program, https://www.sandag.org/funding/transnet (as of Nov. 28, 2023).

[7] See Pub. Util. Code, § 132351.1, subds. (a), (d).

[8] See MTS, About MTS, https://www.sdmts.com/about/about-mts (as of Nov. 28, 2023).

[9] See Pub. Util. Code, §§ 120050, 120054.

[10] See Pub. Util. Code, § 120050.2.

[11] See Agenda, Joint Meeting of the Audit Oversight Committee for the MTS (Feb. 14, 2008), at p. C-1 (eighth page of PDF document), https://www.sdmts.com/sites/default/files/aoc_2-14.pdf (as of Nov. 28, 2023) (Audit Committee Agenda).

[12] See Assemblymember David A. Alvarez, letter to Acting Senior Assistant Attorney General Marc J. Nolan, Mar. 16, 2023, at p. 1 (Request for Opinion).

[13] See Request for Opinion, at p. 1.

[14] The opinion request asks only about applicable *state* law. We express no opinion as to

23-302

## 1. Would the dual office holding violate state law?

The first question here asks whether state law would prohibit a public member of the City Audit Committee from serving concurrently in one or more of three other government positions. The primary statute governing that question is Government Code section 1099, which prohibits a "public officer" from "simultaneously hold[ing] two public offices that are incompatible."[15] The prohibition "springs from considerations of public policy which demand that a public officer discharge his or her duties with undivided loyalty."[16] Upon a finding that two offices are legally incompatible, "a public officer shall be deemed to have forfeited the first office upon acceding to the second."[17]

There are two steps in a section 1099 analysis.[18] First, we determine if each position at issue is a "public office" subject to the prohibition. Second, if both positions are "public offices," then we consider whether they are legally incompatible. Applying that approach here, we will evaluate whether section 1099 would prohibit concurrently

---

whether the simultaneous government service at issue could violate any *local* law, such as the San Diego City Charter or Administrative Regulations. (See State of California, Office of the Attorney General, Guidelines Regarding Attorney General Opinions Under Government Code Section 12519, at p. 2, https://oag.ca.gov/system/files/media/ag-opinion-guidelines.pdf (as of Nov. 28, 2023) ["The Attorney General declines requests for opinions that exclusively call for interpretation of local laws such as charters or ordinances. Responsibility for interpreting and enforcing local laws rests with local government lawyers"].)

[15] The prohibition does not apply if the "simultaneous holding of the particular offices is compelled or expressly authorized by law." (Gov. Code, § 1099, subd. (a).) No law compels or expressly authorizes the simultaneous holding of the offices at issue here.

[16] 68 Ops.Cal.Atty.Gen. 337, 339 (1985).

[17] Gov. Code, § 1099, subd. (b). Because section 1099 "codifies the common law rule prohibiting an individual from holding incompatible public offices" (*id.*, § 1099, subd. (f)), "our construction and application" of the statute are "guided by administrative and judicial interpretations developed under the common law," before section 1099's enactment in 2005 (93 Ops.Cal.Atty.Gen. 144, 146 (2010)). (See also Stats. 2005, ch. 254, § 2 ["Nothing in this act is intended to expand or contract the common law rule prohibiting an individual from holding incompatible public offices. It is intended that courts interpreting this act shall be guided by judicial and administrative precedent concerning incompatible public offices developed under the common law"].)

[18] See 104 Ops.Cal.Atty.Gen. 66, 68-69 (2021); 102 Ops.Cal.Atty.Gen. 39, 41-47 (2019).

23-302

serving in each pair of government positions.  If it would not, then we will consider whether any other state conflict-of-interest law would apply.[19]

### Are the positions "public offices" subject to section 1099?

The section 1099 prohibition applies only to "public offices" and not to "position[s] of employment."[20]  The statute provides that a "public officer" includes "an appointed or elected member of a governmental board, commission, committee, or other body," so long as the body's powers are not merely "advisory."[21]  We evaluate whether a government position is a "public office" by applying a three-part test:  we ask whether it is "a position in government (1) which is created or authorized by the Constitution or some law; (2) the tenure of which is continuing and permanent, not occasional or temporary; (3) in which the incumbent performs a public function for the public benefit and exercises some of the sovereign powers of the state."[22]  "Sovereign powers of the state" include statutorily imposed duties related to the exercise of state police powers; power to dispose of public property; power to incur financial obligations on the part of the government; and power to act in business or political dealings between individuals and the public.[23]  A position can qualify as a "public office" even if it is not compensated.[24]

Relevant here, past Attorney General opinions and judicial decisions have considered whether government positions with auditing and oversight authority are "public offices."  We have concluded, for example, that the position of county auditor is a "public office" because it is established by statute, it is filled through regular elections,

---

[19] Our analysis is based on the facts provided to us and our reading of the state and local laws that define the authority of the relevant government positions.  If the actual powers or circumstances of those positions were to differ from our understanding, then our analysis and conclusion may of course differ as well.

[20] Gov. Code, § 1099, subds. (a), (c).

[21] Gov. Code, § 1099, subds. (a), (d).

[22] 102 Ops.Cal.Atty.Gen., *supra*, at pp. 42-43; see 95 Ops.Cal.Atty.Gen. 77, 78 (2012); 93 Ops.Cal.Atty.Gen., *supra*, at p. 148; 93 Ops.Cal.Atty.Gen. 104, 105-106 (2010); 82 Ops.Cal.Atty.Gen. 83, 84 (1999); see also *Moore v. Panish* (1982) 32 Cal.3d 535, 545.

[23] 73 Ops.Cal.Atty.Gen. 183, 184-185 (1990); see 104 Ops.Cal.Atty.Gen., *supra*, at pp. 68-69; 102 Ops.Cal.Atty.Gen., *supra*, at pp. 43-44.

[24] See, e.g., 66 Ops.Cal.Atty.Gen. 176, 180-181 (1983) (even if fire chief waived a salary, he would remain a public officer subject to the incompatible-offices prohibition); 68 Ops.Cal.Atty.Gen. 7, 10-11 (1984) (same for deputy sheriff).

and it is vested with sovereign government authority to audit county operations.[25]  In contrast, the Court of Appeal held in *Schaefer v. Superior Court* that an unelected employee of the California Department of Employment who served as auditor in charge of a local district audit office did not hold a "public office."[26]  The court reasoned that the position was not created by law, it was "subordinate to four other positions" in the organizational hierarchy, and it possessed limited discretionary authority.[27]

With these authorities in mind, we will evaluate whether each of the four government positions at issue is a "public office" subject to section 1099.  We conclude that all positions are "public offices" except for the MTS Internal Auditor.

### Public member of City Audit Committee

The City of San Diego Audit Committee is an "independent body" with "oversight responsibility regarding the City's auditing, internal controls, and . . . other financial or business practices."[28]  The Committee's five members include two City Council members and three public members appointed by the City Council.[29]  The three public appointees "must possess the independence, experience, and technical expertise necessary to carry out the [Committee's] duties."[30]  The Committee meets at least once per quarter, conducting its meetings in accordance with the requirements of the Brown Act.[31]

To determine whether a public appointee to the City Audit Committee holds a "public office," we apply the three-part test described above.[32]  First, the Committee is created by law, specifically, section 39.1 of the San Diego City Charter.[33]  Second,

---

[25] 89 Ops.Cal.Atty.Gen. 152, 154 (2006); see also, e.g., 88 Ops.Cal.Atty.Gen. 130, 130-131 (2005) (county auditor-controller is a "public office"); 101 Ops.Cal.Atty.Gen. 56, 60 (2018) (county superintendent of schools is a "public office," in part due to superintendent's "authority to audit the expenditures and internal controls of school districts").

[26] *Schaefer v. Superior Ct.* (1952) 113 Cal.App.2d 428, 433-436.

[27] *Schaefer v. Superior Ct.*, *supra*, 113 Cal.App.2d at pp. 433-436.

[28] San Diego City Charter, art. V, § 39.1.

[29] San Diego City Charter, art. V, § 39.1.

[30] San Diego City Charter, art. V, § 39.1; see also San Diego Munic. Code, § 26.1702.

[31] San Diego Munic. Code, § 26.1703.

[32] See 102 Ops.Cal.Atty.Gen., *supra*, at pp. 42-43.

[33] See also San Diego City Charter, art. V, § 39.2 (further describing role of Audit

6

membership on the Committee is continuing, with public members serving four-year terms and until a successor is appointed.[34] Third, the Committee is charged with performing "important governmental functions requiring the exercise of independent judgment" related to the City's auditing function.[35] The Committee's duties include directing and reviewing the work of the City Auditor, who reports directly to the Committee; conducting the City Auditor's annual performance evaluation; and reviewing and approving the City's annual audit plan.[36] The Committee also monitors the engagement of the City's outside auditor, and it resolves any disputes that arise between the outside auditor and City management concerning the City's annual financial reports.[37] As noted, we have previously concluded that local government positions with similar auditing authority are "public offices."[38] We likewise conclude that a public appointee to the City Audit Committee holds a "public office" as well.

Public member of ITOC

The next two government bodies at issue are committees of SANDAG, the San Diego Association of Governments. First, the TransNet Independent Taxpayer Oversight Committee, or ITOC, provides increased accountability for expenditures made under the TransNet program.[39] As described above, TransNet is a sales tax administered by SANDAG that funds local transportation projects, including projects carried out by the

---

Committee); San Diego Munic. Code, §§ 26.1701-26.1711 (describing structure and duties of Audit Committee).

[34] See San Diego City Charter, art. V, § 39.1; see also 83 Ops.Cal.Atty.Gen. 153, 156 (2000) (membership on commission was "public office" where each "member's tenure is not transient, and incumbents succeed one another").

[35] 101 Ops.Cal.Atty.Gen., *supra*, at p. 61.

[36] San Diego Munic. Code, §§ 26.1701, subd. (a), 26.1710, subd. (a); see, e.g., 82 Ops.Cal.Atty.Gen. 201, 202-203 (1999) (city administrator was "public office" due, in part, to administrator's authority to direct and supervise other government actors).

[37] San Diego Munic. Code, § 26.1701, subd. (a)(7).

[38] See, e.g., 89 Ops.Cal.Atty.Gen., *supra*, at p. 154 (county auditor); 88 Ops.Cal.Atty.Gen., *supra*, at pp. 130-131 (county auditor-controller).

[39] TransNet Extension & Ordinance, at p. 14, § 11 (2004) (voter initiative establishing ITOC), https://www.sandag.org/-/media/SANDAG/Documents/PDF/funding/transnet/transnet-extension-ordinance-and-expenditure-plan.pdf (as of Nov. 28, 2023); *id.*, Statement of Understanding Regarding the Implementation of the Independent Taxpayer Oversight Committee For the TransNet Program, at p. 44 (Statement of Understanding Regarding Implementation of ITOC).

23-302

City of San Diego.[40]  A 2004 voter initiative that extended TransNet created the ITOC to provide increased oversight of program implementation.[41]  The ITOC consists of seven voting members, selected by a committee of public officials to represent different areas of subject matter expertise.[42]  Members serve without compensation except for reimbursement of expenses.[43]

Applying the three-part test, we conclude that a public appointee to the ITOC holds a "public office."[44]  The ITOC is created by law, specifically, the 2004 voter initiative that extended TransNet.[45]  Membership on the ITOC is continuing, with members serving four-year terms.[46]  And the ITOC performs important "public function[s] for the public benefit" concerning auditing and oversight.[47]  The ITOC is charged with conducting an annual fiscal and compliance audit of all TransNet-funded activities through an independent fiscal auditor and preparing a report for the SANDAG Board.[48]  It also conducts triennial performance audits of SANDAG and other agencies to review delivery, cost control, and schedule adherence of TransNet-funded projects; it reviews ongoing SANDAG system performance evaluations; and it reviews proposed debt financings and major congestion relief projects.[49]

---

[40] See SANDAG, SANDAG TransNet Program, https://www.sandag.org/funding/transnet (as of Nov. 28, 2023); Request for Opinion, at p. 1.

[41] See TransNet Extension & Ordinance, at p. 14, § 11; Statement of Understanding Regarding Implementation of ITOC, at p. 44.

[42] See Statement of Understanding Regarding Implementation of ITOC, at pp. 45-46; SANDAG, TransNet Independent Taxpayer Oversight Committee Bylaws, at pp. 1-2, §§ A, B, https://www.sandag.org/-/media/SANDAG/Documents/PDF/meetings-and-events/policy-advisory-committees/transnet-ITOC/ITOC-bylaws.pdf (as of Nov. 28, 2023).

[43] See Statement of Understanding Regarding Implementation of ITOC, at p. 46.

[44] See 102 Ops.Cal.Atty.Gen., *supra*, at pp. 42-43; see also 89 Ops.Cal.Atty.Gen., *supra*, at p. 154 (county auditor is a "public officer"); 88 Ops.Cal.Atty.Gen., *supra*, at pp. 130-131 (county auditor-controller is a "public officer").

[45] See TransNet Extension & Ordinance, at p. 14, § 11.

[46] See Statement of Understanding Regarding Implementation of ITOC, at pp. 46-47.

[47] 101 Ops.Cal.Atty.Gen., *supra*, at p. 59.

[48] Statement of Understanding Regarding Implementation of ITOC, at p. 47.

[49] Statement of Understanding Regarding Implementation of ITOC, at pp. 47-48.

Public member of SANDAG Audit Committee

The second SANDAG committee at issue, the Audit Policy Advisory Committee, "assist[s] the [SANDAG] Board in fulfilling its oversight responsibilities."[50] Established by statute as one of five standing policy advisory committees, the SANDAG Audit Committee "provide[s] a forum for pursuing . . . opportunities for improvements in operations, financial reporting and internal controls."[51] The Committee has five voting members, including two SANDAG Board members and three members of the public appointed by the Board.[52] Public members serve without compensation.[53]

Applying the three-part test, we conclude that a public appointee to the SANDAG Audit Committee holds a "public office" as well. The Committee is established by statute, specifically, section 132351.4 of the Public Utilities Code.[54] Membership on the Committee is continuing, with public members serving two-year terms.[55] And the SANDAG Audit Committee, like the ITOC, exercises important government powers concerning auditing and oversight.[56] The Committee's duties include recommending an outside auditing firm to conduct annual financial statement audits and overseeing both the conduct of such audits and the implementation of corrective action to address audit deficiencies.[57] In addition, the Committee appoints (subject to approval by the SANDAG Board) an independent performance auditor who has broad authority to audit all agency departments, offices, boards, activities, and programs.[58] The independent performance

---

[50] SANDAG Board Policy No. 39, § 2.5, https://www.sandag.org/-/media/SANDAG/Documents/PDF/about/about-SANDAG/bylaws-and-policies/board-policy-no-039.pdf (as of Nov. 28, 2023).

[51] See Pub. Util. Code, § 132351.4, subd. (a)(5); SANDAG Board Policy No. 39, § 2.5.

[52] Pub. Util. Code, § 132351.4, subd. (a)(5).

[53] See Request for Opinion, at p. 8.

[54] See Pub. Util. Code, § 132351.4, subd. (a), (a)(5) (establishing SANDAG Audit Committee); see also *id.*, § 132354.1, subd. (b)(1) (describing Committee's duties).

[55] See SANDAG Board Policy No. 39, § 4.1.4.

[56] See 101 Ops.Cal.Atty.Gen., *supra*, at p. 59 (third prong of test for "public office").

[57] See SANDAG Board Policy No. 39, §§ 3.1.1, 3.1.3.

[58] See Pub. Util. Code, § 132354.1, subd. (b)(1), (2); SANDAG Board Policy No. 39, § 3.1.4. The independent performance auditor has the "power to appoint, employ, and remove assistants, employees, and personnel" and receives "unrestricted access to employees, information, and records." (Pub. Util. Code, § 132354.1, subd. (b)(2), (3).)

9

23-302

auditor reports directly to the Audit Committee, which oversees the performance auditor's work and conducts the auditor's annual performance evaluation.[59]

We received one comment letter arguing that membership on the SANDAG Audit Committee is not a "public office" on the ground that the Committee's powers are purely advisory. Under Government Code section 1099(d), the incompatible-office prohibition does "not apply to a governmental body that has only advisory powers." As we have previously explained, "[m]embers of advisory boards and commissions do not hold 'offices'" for these purposes because "they do not exercise any of the sovereign powers of the state."[60] For example, we have applied this limitation to conclude that membership on the California Senior Legislature was not a "public office" because the Senior Legislature was only an "advisory body" that proposed "model legislation" for consideration by the Legislature.[61] In contrast, we have concluded that membership on the Job Training, Development and Placement Services Advisory Board was a "public office."[62] We acknowledged that the Board had "Advisory" in its name. But "despite its title," we reasoned that the Board had "affirmative duties [taking] it out of the 'advisory' category"—including responsibility to consult with other agencies to develop job-training programs, and authority to approve plans for related government spending.[63]

---

[59] SANDAG Board Policy No. 39, §§ 3.1, 6.1.

[60] 83 Ops.Cal.Atty.Gen., *supra*, at p. 154; see also 83 Ops.Cal.Atty.Gen. 50, 52 (2000); 62 Ops.Cal.Atty.Gen. 325, 328-329 (1979).

[61] 83 Ops.Cal.Atty.Gen., *supra*, at p. 157; see also *id.* at pp. 157-160 (Area Agency on Aging Advisory Council of California is an advisory body and membership is not a "public office"); 42 Ops.Cal.Atty.Gen. 93, 95 (1963) (membership on advisory board of the Joint Legislative Committee for the Revision of the Penal Code not a public office); 57 Ops.Cal.Atty.Gen. 583, 585 (1974) ("Since the function of the Committee of Bar Examiners is advisory only, neither it nor its members exercise any of the sovereign powers of the State"); 57 Ops.Cal.Atty.Gen. 303, 306 (1974); Cal.Atty.Gen., Indexed Letter, No. I.L. 69-226 (Nov. 18, 1969); Cal.Atty.Gen., Indexed Letter, No. I.L. 79-3 (Jan. 5, 1979); see *California Coastal Com. v. Quanta Investment Corp.* (1980) 113 Cal.App.3d 579, 593, fn. 11 ("An indexed letter is different from a formal opinion of the Attorney General, which is widely disseminated throughout the state and is ultimately published in bound volumes. Indexed letters are kept in the Attorney General's four libraries and are ordinarily made available to interested members of the public upon request").

[62] Cal.Atty.Gen., Indexed Letter, No. I.L. 72-143 (Aug. 16, 1972).

[63] Cal.Atty.Gen., Indexed Letter, No. I.L. 72-143, *supra*, at pp. 2-3.

10

Here too, "despite its title"—the SANDAG Audit Policy *Advisory* Committee—we conclude that the Committee's powers "take it out of the 'advisory' category."[64] Although some of the Committee's duties involve making recommendations subject to SANDAG Board approval, in other respects the Committee exercises independent authority and discretion. For example, the Committee oversees and evaluates the work of the independent performance auditor, who has considerable authority to audit and investigate the agency's performance.[65] As part of its oversight role, the Committee is charged with approving the annual audit plan prepared by the independent performance auditor.[66] It also monitors the auditor's implementation of the plan and approves follow-up audit procedures.[67] And the Committee has veto power over the performance auditor's removal: the auditor can be removed only "for cause" by a two-thirds vote of both "the audit committee and the [SANDAG] board."[68] Given these important oversight responsibilities, we conclude that the SANDAG Audit Committee "exercises a portion of the sovereign powers of the state," such that Committee membership is a "public office."[69]

---

[64] Cal.Atty.Gen., Indexed Letter, No. I.L. 72-143, *supra*, at p. 2.

[65] See SANDAG Board Policy No. 39, § 3.1.6 (SANDAG Audit Committee "[o]versee[s] the work of the independent performance auditor in preparing and issuing audit and investigative reports and other audit, review or attest activities"); *id.*, § 3.1.11 (Committee "[c]onduct[s] the independent performance auditor's annual performance evaluation against performance measures established and adopted by the Audit Committee"); *id.*, § 6.1 ("The independent performance auditor shall report to the Audit Committee and shall be independent of SANDAG's internal management and administration"); Pub. Util. Code, § 132354.1, subd. (b)(2)-(4) (describing authority and responsibility of independent performance auditor); SANDAG Board Policy No. 39, § 6 (same); see also, e.g., 82 Ops.Cal.Atty.Gen., *supra*, at pp. 202-203 (city administrator position was "public office" due, in part, to administrator's authority to oversee and supervise the work of other government personnel).

[66] SANDAG Board Policy No. 39, § 3.1.7; Pub. Util. Code, § 132354.1, subd. (b)(2); see Cal.Atty.Gen., Indexed Letter, No. I.L. 72-143, *supra*, at p. 3 (board's power not advisory where it was charged with approving course of action).

[67] See SANDAG Board Policy No. 39, §§ 3.1.8, 3.1.9 (monitoring implementation of audit plan and corrective action), 6.9 (approval of follow-up audit procedures).

[68] See Pub. Util. Code, § 132354.1, subd. (b)(1); SANDAG Board Policy No. 39, § 3.1.12; see also, e.g., 67 Ops.Cal.Atty.Gen. 409, 413 (1984) (authority to "fire personnel" is indicia of "public office").

[69] 83 Ops.Cal.Atty.Gen., *supra*, at p. 52. We emphasize that the power to audit can indicate that a body is not purely "advisory" for purposes of section 1099(d). As

11

MTS Internal Auditor

Finally, we consider the Internal Auditor for the Metropolitan Transit System. As described above, the MTS provides light rail, bus, and freight service in San Diego County. MTS employs an Internal Auditor, who audits internal controls, program operations, program outcomes, and financial and other management data quality.[70] The Internal Auditor executes an annual audit plan that is developed and approved by senior management and the MTS Board.[71] In the organization's hierarchy, the Internal Auditor is three steps removed from the Board—with the Auditor reporting to the General Counsel, who reports to the Chief Executive Officer, who is appointed by the Board.[72]

Applying the three-part test, we conclude that the position of MTS Internal Auditor is not a "public office." First, unlike the committee memberships discussed above, the Internal Auditor position is not created by any law; its "duties and powers . . . are not specified by statute, charter, or ordinance."[73] Second, as to the position's "tenure," it is not one where "the office itself is an entity in which incumbents succeed one another"—for example, with a fixed term and regular succession.[74] Rather, our understanding is that the position is "transitory" in that it is "subject to being abolished if [senior decision makers] so choose."[75] Third, the position's structure and authority

---

discussed below, section 1099(a)(1) provides that two offices are legally incompatible if either office can "audit" the other. Given that auditing authority is a type of government power that can render two offices incompatible, it would make no sense to conclude that a government office with significant auditing responsibility is nonetheless an "advisory" body, exempt from section 1099 entirely.

[70] See Request for Opinion, at p. 4; Audit Committee Agenda, at p. C-1 (eighth page of PDF document).

[71] See Audit Committee Agenda, at p. C-1 (eighth page of PDF document).

[72] See Request for Opinion, at p. 4; MTS Organizational Chart, at pp. 1 (fifth page of PDF), 6 (tenth page of PDF), https://www.sdmts.com/sites/default/files/attachments/org-chart-021723.pdf (as of Nov. 28, 2023).

[73] 78 Ops.Cal.Atty.Gen. 362, 367 (1995) (sheriff's deputy chief not a "public office," in part because position not created by law); see also 81 Ops.Cal.Atty.Gen. 274, 276 (1998) (position of housing authority secretary and executive director "is a creature of a contract entered into by the authority, which sets the terms of employment. A public officer is not the offspring of a contract"); 104 Ops.Cal.Atty.Gen., *supra*, at p. 73.

[74] *Dibb v. Cnty. of San Diego* (1994) 8 Cal.4th 1200, 1212.

[75] 81 Ops.Cal.Atty.Gen., *supra*, at p. 276; see also 78 Ops.Cal.Atty.Gen, *supra*, at p. 367 ("A [sheriff's] deputy chief . . . does not hold a policy-making position. Rather, he has an

further indicate that it is not a "public office." Unlike the City Audit Committee, for instance—which approves the City's annual audit plan—the MTS Internal Auditor executes an audit plan developed and approved by senior MTS management and the Board.[76] Where a government position "execut[es] decisions made by" more senior actors, the position does not typically "exercise [the] independent judgment[,] discretion," or policy-making authority that are hallmarks of a "public office."[77] The Internal Auditor's placement in the organizational hierarchy—three steps removed from the Board—also suggests that the position is one of employment.[78] The circumstances here are analogous to *Schaefer*, where the Court of Appeal held that a state employee with auditing responsibilities did not hold a "public office" because the position was not created by law, it was four steps removed from the agency director, and it had relatively limited discretionary authority.[79]

### *Would the dual office holding violate section 1099 or any other state law?*

Having determined which positions are "public offices," we turn to the second step of the section 1099 analysis: evaluating whether the offices are legally incompatible. Section 1099 codifies the common-law rule that two offices are incompatible where a dual office holder could face a "conflict of interest."[80] Specifically, it provides that two "public offices" are incompatible if either office exercises a supervisory, auditing, or removal power over the other; if there is a possibility of a significant clash of duties or

administrative position which could be eliminated by internal reorganization").

[76] See Audit Committee Agenda, at p. C-1 (eighth page of PDF document).

[77] 104 Ops.Cal.Atty.Gen., *supra*, at p. 73; see *id.* at p. 74 (charter school directors "typically carry out the directives of their employer rather than exercising sovereign state authority"); see also 101 Ops.Cal.Atty.Gen., *supra*, at p. 59 ("The authority to make policy or to exercise independent judgment and discretion is also the hallmark of an officer, as opposed to an employee"); 93 Ops.Cal.Atty.Gen., *supra*, at pp. 148-149.

[78] See, e.g., *People v. Rosales* (2005) 129 Cal.App.4th 81, 86 (superintendent of county department of parks and recreation not a "public office" where position was subject to multiple levels of supervision); 80 Ops.Cal.Atty.Gen. 74, 77 (1997) (assistant city manager was an employee where position's responsibilities were "as directed by the city manager"; the "fact that the assistant city manager may from time to time perform some of the duties of the city manager does not transform . . . the position . . . into a public office"); 65 Ops.Cal.Atty.Gen. 316, 318-321 (1982).

[79] See *Schaefer v. Superior Ct.*, *supra*, 113 Cal.App.2d at pp. 433-436.

[80] *People ex rel. Chapman v. Rapsey* (1940) 16 Cal.2d 636, 642 (legal incompatibility "does not consist in the physical impossibility to discharge the duties of both offices" but rather lies "in a conflict of interest").

13

loyalties between the offices; or if the dual office holding would be improper for reasons of public policy.[81]  To find that two offices are incompatible, a conflict need not have actually occurred; it is enough that a conflict *might* occur in the regular operation of the statutory plan.[82]  Nor is it necessary for a clash of duties to occur in all or in the greater part of the official functions.[83]  Indeed, "[o]nly one potential significant clash of duties or loyalties is necessary to make offices incompatible."[84]  When two offices are incompatible, the conflicted officeholder may not escape the effects of the doctrine by choosing not "'to perform one of the incompatible roles.  The doctrine was designed to avoid the necessity for that choice.'"[85]

Applying these rules here, we conclude that the offices at issue in questions 1(a) and 1(b) would be legally incompatible.  For question 1(c), we conclude that section 1099 would not apply, so we will also analyze other state conflict-of-interest laws.

Question 1(a): City Audit Committee and ITOC

Question 1(a) asks whether a public member of the City Audit Committee could serve simultaneously on the SANDAG TransNet Independent Taxpayer Oversight Committee, or ITOC.  Given our conclusion above that both positions are "public offices" subject to section 1099, we must evaluate whether the two offices are legally incompatible.  Relevant to that inquiry, the two committees could oversee an audit of the same subject matter.  For example, the City receives TransNet funds from SANDAG.[86]  Both the City Audit Committee and the ITOC could be charged with performing or overseeing an audit of the City's use of those funds.[87]

---

[81] Gov. Code, § 1099, subd. (a)(1)-(3); see 101 Ops.Cal.Atty.Gen., *supra*, at pp. 61-62.

[82] 98 Ops.Cal.Atty.Gen. 94, 96 (2015).

[83] *People ex rel. Chapman v. Rapsey*, *supra*, 16 Cal.2d at pp. 641-642.

[84] 85 Ops.Cal.Atty.Gen. 199, 200 (2002).

[85] 67 Ops.Cal.Atty.Gen., *supra*, at p. 414, quoting 3 McQuillin, Municipal Corporations (rev. ed. 1973) § 12.67, pp. 295-296.

[86] See Request for Opinion, at p. 1; San Diego City Attorney, Memorandum to Independent Budget Analyst, Oct. 5, 2022, at p. 2.

[87] The ITOC conducts "an annual fiscal and compliance audit of all TransNet-funded activities using the services of an independent fiscal auditor."  (Statement of Understanding Regarding Implementation of ITOC, at p. 47.)  The audit must "cover all recipients of TransNet funds."  (*Ibid.*)  As to the City Audit Committee, it could also oversee an audit of the City's use of TransNet funds given its broad oversight authority.  (See San Diego Munic. Code, §§ 26.1701, subd. (a), 26.1710.)

Given this overlap in auditing jurisdiction, we conclude that dual committee membership could create a conflict of interest that compromises independent decision-making. In the above scenario, for example, one committee (or its direct reports) might conclude that the City's use of TransNet funds complied with all legal requirements. If the other committee then identified improprieties, its conclusions could reflect poorly on the first committee and its members, who failed to uncover any issues. To avoid that outcome, a dual committee member could be influenced to encourage both committees to reach the same conclusions.[88] The remaining committee members might also be influenced, "even unconsciously," to avoid any findings that could impugn their colleague's work on the other committee.[89] Where, as here, an official is "in the untenable position of having to advise . . . on a proposal or stance he or she had already approved" in another office, the two offices are incompatible.[90]

Moreover, a person serving simultaneously on both committees could also face divided loyalties if the interests of SANDAG and the City diverged.[91] We have previously concluded, for example, that where a county office and a statewide office shared overlapping supervisory authority over school districts, it "would inevitably lead

---

[88] See 85 Ops.Cal.Atty.Gen. 239, 240 (2002) ("If the performance of the duties of either office could have an adverse effect on the other, the doctrine precludes acceptance of the second office"); 101 Ops.Cal.Atty.Gen., *supra*, at pp. 64-65 (two offices incompatible where one office had "auditing authority" that "could adversely affect" the other office; a person serving in both roles "might not be able to remain free of bias in deciding whether or how such [audits] should be undertaken").

[89] 63 Ops.Cal.Atty.Gen. 710, 715 (1980) (where one office can audit another, a dual officeholder can create a conflict "because of the inability of [the officeholder's colleagues] to act impartially with respect to [their] co-worker in the office"; "[t]his is analogous to the concept that law partners should not represent conflicting interests any more than an individual lawyer should represent them").

[90] 101 Ops.Cal.Atty.Gen., *supra*, at p. 67. One comment letter argued that there is no conflict in this scenario because the ITOC would be auditing the City's spending—not the spending of the City Audit Committee. The commenter argued that incompatibility under section 1099(a)(1) requires that one "office[] may audit . . . the other office"—not the other office's parent organization. (Gov. Code, § 1099, subd. (a)(1).) But whether section 1099(a)(1) applies or not, we conclude that the dual office holding could compromise independent decision-making—making the offices incompatible under section 1099(a)(2) due to the "possibility of a significant clash of duties or loyalties between the offices." (Gov. Code, § 1099, subd. (a)(2).)

[91] See Gov. Code, § 1099, subd. (a)(2) (offices incompatible where "there is a possibility of a significant clash of duties or loyalties between the offices").

15

to divided loyalties" for the same person to serve in both offices:  the two positions may need to perform their overlapping supervisory duties from different "perspective[s]," one "local" and one "statewide."[92]  Similarly, here, the City Audit Committee and the ITOC may bring different "perspective[s]" to bear in carrying out their overlapping authority, for example, to oversee an audit of the City's use of TransNet funds.[93]  "What may be in the best interests" of the City in performing such an audit "may not be in the best interests of" SANDAG.[94]  In these circumstances, "[h]aving the same person performing" both auditing roles could result in "divided loyalties."[95]

We recognize that the City Audit Committee and the ITOC were created to provide independent oversight of the City and SANDAG, respectively.  For this reason, one commenter argued that the duties of the two committees' members—to ensure good governance and legal compliance—are aligned, not in conflict.  But despite the measures taken to encourage independence, each committee has an ongoing relationship with its parent entity; for example, the three public members of the City Audit Committee serve alongside two sitting San Diego City Councilmembers.[96]  And, in executing its oversight functions, each committee may need to make judgment calls informed by its parent organization's interests.  For example, the ITOC must allocate finite auditing resources between the City and other TransNet fund recipients.  In these circumstances, an individual serving simultaneously on both committees—charged with overlapping auditing functions that impact both the City and SANDAG—could face loyalties divided between the two entities.[97]  For these reasons, we conclude that section 1099 would prohibit a public member of the City Audit Committee from serving concurrently as a public member of the ITOC.[98]

---

[92] 78 Ops.Cal.Atty.Gen. 316, 321-322 (1995) (membership on county board of supervisors incompatible with membership on California Community Colleges Board of Governors due to overlapping supervisory authority over community college districts in the county); see also 74 Ops.Cal.Atty.Gen. 116 (1991) (membership on State Board of Education incompatible with position of county superintendent of schools given overlapping authority to supervise schools within the county).

[93] 78 Ops.Cal.Atty.Gen., *supra*, at p. 322

[94] 78 Ops.Cal.Atty.Gen., *supra*, at p. 322.

[95] 78 Ops.Cal.Atty.Gen., *supra*, at p. 322.

[96] See San Diego City Charter, art. V, § 39.1.

[97] See 78 Ops.Cal.Atty.Gen., *supra*, at p. 322.

[98] In light of that conclusion, we need not consider whether any other state conflict-of-interest law would also apply.

For similar reasons, we conclude that section 1099 would also prohibit a public member of the City Audit Committee from serving simultaneously as a public member of the SANDAG Audit Committee. Once again, both positions are "public offices" subject to the section. And dual committee membership could again create a conflict of interest because the two committees could oversee audits of the same subjects. For example, both the SANDAG Audit Committee and the City Audit Committee could oversee audits of a project involving both SANDAG and the City.[99] The two committees could also have overlapping jurisdiction to audit contracts between SANDAG and the City—with each committee potentially gaining access to the other contracting party's records.[100] Given these overlaps in auditing jurisdiction, a dual committee member could face the same conflicts discussed above.[101]

### Question 1(c): City Audit Committee and MTS Internal Auditor

As explained above, section 1099 prohibits serving in two government positions only if they are both "public offices."[102] We concluded above that the Metropolitan Transit System's Internal Auditor does not hold a "public office" for these purposes. We therefore conclude, in response to question 1(c), that section 1099 would not prohibit the Internal Auditor from serving concurrently on the City Audit Committee. We will consider next whether any other state law would apply in these circumstances.

**Government Code section 1126**. Government Code section 1126 prohibits local agency personnel from engaging in certain incompatible outside activities.[103] Specifically, it prohibits "a local agency officer or employee" from "engag[ing] in any employment, activity, or enterprise for compensation which is inconsistent, incompatible,

---

[99] See SANDAG Board Policy No. 39, §§ 3.1.6-3.1.7, 6; San Diego Munic. Code, §§ 26.1701, subd. (a), 26.1710; see also San Diego City Attorney, letter to City Audit Committee member, Apr. 21, 2022, at p. 2.

[100] See San Diego City Charter, art. V, § 39.2 ("All City contracts with consultants, vendors, or agencies will be prepared with an adequate audit clause to allow the City Auditor access to the entity's records needed to verify compliance with the terms specified in the contract"); SANDAG Board Policy No. 39, § 6.16 (describing SANDAG's rights of access to the records of contracting parties).

[101] See 85 Ops.Cal.Atty.Gen., *supra*, at p. 240; 101 Ops.Cal.Atty.Gen., *supra*, at p. 65.

[102] See Gov. Code, § 1099, subd. (a) ("A *public officer* . . . shall not simultaneously hold two *public offices* that are incompatible," italics added).

[103] A similar prohibition exists for state officers and employees. (See Gov. Code, § 19990.)

23-302

in conflict with, or inimical to his or her duties as a local agency officer or employee."[104] Importantly, however, the section 1126 prohibition is "not self-executing."[105] Rather, the statute gives each local agency's appointing authority discretion to determine which outside activities, if any, are incompatible.[106] The statute provides a non-exhaustive list of activities that the agency may draw on in making that determination.[107] An agency must notify its officers and employees as to which activities are incompatible and provide notice of any "intended disciplinary action."[108] If an agency does not determine that a given outside activity is incompatible and provide appropriate notice, then section 1126 does not apply.[109]

There are two government positions at issue here—MTS Internal Auditor and City Audit Committee member—so we will consider whether section 1126 could apply to either. First, the position of MTS Internal Auditor is subject to section 1126 because the Auditor is an "employee" of a "local agency," the MTS.[110] Section 1126 would not prohibit the Internal Auditor from also serving on the City Audit Committee, however, because the prohibition applies only to outside activities that are compensated, and public members of the City Audit Committee are unpaid.[111]

---

[104] Gov. Code, § 1126, subd. (a). The statute further prohibits engaging in any compensated outside activities that are inconsistent with "the duties, functions, or responsibilities of [the local agency officer or employee's] appointing power or the agency by which he or she is employed." (*Ibid.*)

[105] 81 Ops.Cal.Atty.Gen., *supra*, at p. 277.

[106] See 81 Ops.Cal.Atty.Gen., *supra*, at p. 277; *Mazzola v. City & Cnty. of San Francisco* (1980) 112 Cal.App.3d 141, 154; *Long Beach Police Officers Assn. v. City of Long Beach* (1988) 46 Cal.3d 736.

[107] See Gov. Code, § 1126, subd. (b); see also *Long Beach Police Officers Assn. v. City of Long Beach*, *supra*, 46 Cal.3d at p. 746 (local agency is "free to set standards different from or more rigorous than those suggested in the statute").

[108] *Mazzola v. City & Cnty. of San Francisco*, *supra*, 112 Cal.App.3d at p. 154; see *ibid.* (notice gives employee or officer "a chance to either appeal the agency's determination" or else resolve the conflict by "resign[ing] from either his outside or agency position").

[109] E.g., *Mazzola v. City & Cnty. of San Francisco*, *supra*, 112 Cal.App.3d at p. 155 (agency was precluded from alleging section 1126 violation where it knew of employee's outside activities at time of appointment and did not notify him they were incompatible).

[110] Gov. Code, § 1126, subd. (a); see Gov. Code, § 1125 (defining "local agency" as "a county, city, city and county, political subdivision, district, or municipal corporation").

[111] See Gov. Code, § 1126, subd. (a); Request for Opinion, at p. 7.

Second, members of the City Audit Committee are also subject to section 1126 because they are "officer[s]" of the City of San Diego, a "local agency."[112] Because the MTS Internal Auditor position is compensated, section 1126 could potentially be applied to prohibit City Audit Committee members from simultaneously serving as the MTS Internal Auditor. As described above, however, section 1126 would apply only if the City Council—the appointing authority for the City Audit Committee—lawfully exercised its "discretion under the statute to determine" that the duties of City Audit Committee members are "incompatible with [the] duties" of serving as the MTS Internal Auditor.[113] In the absence of such a determination—and we are not aware of any— section 1126 would not prohibit a City Audit Committee member from serving concurrently as the MTS Internal Auditor.

**Other state conflict-of-interest laws**. Other state laws prohibit personal and financial conflicts of interest. For example, Government Code section 1090 prohibits city and county officers and employees from being "financially interested in any contract made by them in their official capacity, or by any body or board of which they are members."[114] And the Political Reform Act generally disqualifies public officials from participating in government decisions in which they have a prohibited financial interest.[115] Finally, local officials are also subject to the common-law prohibition on public officials "placing themselves in a position where their private, personal interests may conflict with their official duties."[116]

We see no reason that these prohibitions would apply here. These laws generally regulate conflicts of interest arising from particular transactions or decisions, not status-based conflicts arising from the concurrent holding of multiple government positions.[117] In any event, the request does not reference any type of financial or personal conflict of interest, and the positions at issue do not appear to implicate any such conflict.

---

[112] Gov. Code, § 1126, subd. (a); see Gov. Code, § 1125 (defining "local agency" as "a county, city, city and county, political subdivision, district, or municipal corporation").

[113] 81 Ops.Cal.Atty.Gen., *supra*, at p. 277.

[114] Gov. Code, § 1090, subd. (a); see 67 Ops.Cal.Atty.Gen. 369, 375-377 (1984); 81 Ops.Cal.Atty.Gen., *supra*, at pp. 277-279.

[115] Gov. Code, § 87100; see 85 Ops.Cal.Atty.Gen. 115, 119-122 (2002).

[116] *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1171; see also 81 Ops.Cal.Atty.Gen., *supra*, at pp. 280-281.

[117] See 81 Ops.Cal.Atty.Gen., *supra*, at p. 281 ("[C]onflict of interest principles generally do not bar a person from holding two different positions, instead requiring only abstention when a particular matter arises").

19

## 2.  Would the City Council violate state law if its appointment to the City Audit Committee resulted in the appointee holding incompatible public offices?

The second question presented asks whether the San Diego City Council would violate state law if its appointment to the City Audit Committee resulted in the appointee holding legally incompatible offices.  We conclude that it would not.

As noted above, Government Code section 1099(b) provides the remedy when a public officer assumes two incompatible offices:  the officer is "deemed to have forfeited the first office upon acceding to the second."[118]  The statute further provides that the officer can be removed from the first office through an action in quo warranto.[119]  But neither section 1099, nor any other authority we are aware of, provides that an *appointing authority* violates state law by making such an appointment.[120]  We therefore conclude that the City Council would not violate state law by making an appointment to the City Audit Committee that results in the appointee holding legally incompatible offices.  Rather, under section 1099(b), the appointee would be deemed to forfeit the first office held.

---

[118] Gov. Code, § 1099, subd. (b).

[119] See Gov. Code, § 1099, subd. (b); Code Civ. Proc., § 803.

[120] For example, we are aware of no authority suggesting that the City Council could violate Government Code section 1126 through an Audit Committee appointment.  (See Gov. Code, § 1126, subd. (a) [prohibiting local agency personnel from engaging in certain incompatible outside activities].)  Rather, as discussed above, section 1126 gives local agencies discretion to determine which outside activities, if any, are inconsistent with an agency position.  (See 81 Ops.Cal.Atty.Gen., *supra*, at p. 277.)